**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF FLORIDA**

| | |
|---|---|
| Jean Louis Barreto-Baerga, | |
| Plaintiff, | |
| | **Case No.** |
| v. | |
| Osceola County, Florida; Marcos Lopez; David Crawford; Christopher Koffinas; Joseph DeJesus; Arturo Dominguez; and Benjamin Maclean, | **JURY TRIAL DEMANDED** |
| Defendants. | |

## COMPLAINT

NOW COMES the Plaintiff, Jean Louis Barreto-Baerga, by and through his attorneys, and in complaining of the Defendants, pleads and alleges as follows:

## JURISDICTION AND VENUE

1. This Court has jurisdiction over Plaintiff's federal claims pursuant to 28 U.S.C. §§ 1331, 1343; 42 U.S.C. §§ 1983, 1988; and supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367.

2. Venue is proper in this Court under 28 U.S.C. § 1391(a) because all Defendants reside in the State of Florida and at least one Defendant resides in the Middle District of Florida.

3. Venue is proper in this Court under 28 U.S.C. § 1391(b) because all incidents, events, and occurrences giving rise to this action occurred in Osceola County, Florida, which is in the Middle District of Florida.

**JURY DEMAND**

4.      Pursuant to Federal Rule of Civil Procedure 38, Plaintiff demands a trial by a twelve-person jury on all issues so triable.

**PARTIES**

5.      Plaintiff JEAN LOUIS BARRETO-BARGA is a United States citizen. On February 27, 2022, and at all times relevant to this action, he was a resident of Orlando, Florida.

6.      On February 27, 2022, and at all times relevant to this action, Defendant OSCEOLA COUNTY was a municipal corporation duly incorporated under the laws of the state of Florida, organized and existing as a legal entity.

7.      At all times relevant to this action, Osceola County maintained, as one of its divisions, the Osceola County Sheriff's Office ("OCSO").

8.      At all times relevant to this action, Defendant Sheriff MARCOS R. LOPEZ was the director of the OCSO. Sheriff Lopez is sued in his individual and official capacities.

9.      The Osceola County Sheriff is an elected position.

10.     At all times relevant to this action, Defendant Lopez was Osceola County's final policymaker and decisionmaker regarding the OCSO's policing policies and practices.

11.     At all times relevant to this action, Defendant DAVID CRAWFORD was a duly appointed sheriff's deputy of the OSCO and Osceola County.

12.     During the events described in this complaint, Defendant Crawford was acting within the scope of his employment with the OSCO and Osceola County.

13.     At all times relevant to this action, Defendant CHRISTOPHER KOFFINAS was a duly appointed sheriff's deputy of the OSCO.

14. During the events described in this complaint, Defendant Koffinas was acting within the scope of his employment with the OSCO and Osceola County.

15. At all times relevant to this action, Defendant JOSEPH DEJESUS was a duly appointed sheriff's deputy of the OSCO.

16. During the events described in this complaint, Defendant DeJesus was acting within the scope of his employment with the OSCO and Osceola County.

17. At all times relevant to this action, Defendant ARTURO DOMINGUEZ was a duly appointed sheriff's deputy of the OSCO.

18. During the events described in this complaint, Defendant Dominguez was acting within the scope of his employment with the OSCO and Osceola County.

19. At all times relevant to this action, Defendant BENJAMIN MACLEAN was a duly appointed sheriff's deputy of the OSCO.

20. During the events described in this complaint, Defendant Maclean was acting within the scope of his employment with the OSCO and Osceola County.

21. At all times relevant to the events described in this Complaint, the acts and omissions of the Defendant Deputies (Defendants Crawford, Koffinas, DeJesus, Dominguez, and Maclean) described in this complaint were committed under color of law and within the scope of their employment as duly appointed Osceola County and OCSO employees.

## **FACTUAL ALLEGATIONS**

22. In August 2021, Defendant Sheriff Lopez posted a "Busted by the Sheriff" video to Facebook in which he promised that the OSCO would crack down on people who ride dirt bikes together in the street. *See* https://www.facebook.com/osceolasheriff/videos/busted-by-the-sheriff-sheriff-marcos-r-lopez/1227775857649916/.

3

23.     It was common knowledge among OCSO deputies, including each of the defendants, that people riding such dirt bikes on the streets frequently would flee on their motorbikes from the police if a stop was attempted.

24.     Though the text accompanying the video acknowledged that the enforcement action amounted to traffic law and vehicle registration violations, in the "Busted by the Sheriff" video Sheriff Lopez warns the camera, "we're gonna come after you [and] we're gonna chase you down."

25.     In the video, Sheriff Lopez explains that the "crimes" prompting this crackdown are "poppin' wheelies," "no motorcycle endorsement," and "no tags." The Sheriff promises such motorcyclists that "we're going to come after you, we're going to chase you down, we're going to arrest you [and] book you in the county jail".

26.     In the video Sheriff Lopez repeats, "we're gonna keep coming after you. Don't come to Kissimmee to do this."

27.     The video then cuts to an aerial view of a man riding a motorcycle—who presumably was suspected of a traffic violation—being tracked by a police helicopter at night using infra-red cameras.

28.     The video then cuts to police on the ground releasing a police attack dog against the man, who jumps into a bayou to avoid being mauled, and who must then be rescued from the water.

29.     Instead of acknowledging that officers had used broadly excessive force to apprehend someone suspected of a traffic violation, the video holds up the encounter as emblematic of the "zero tolerance" policy that Sheriff Lopez promised the OCSO would use against group motorcycle riders going forward.

30.     The video encouraged gratuitous uses of police resources and police violence, including an attack dog, in response to minor suspected criminal violations.

31.     This was not Sheriff Lopez's only encouragement of disproportionate violence against persons suspected of even minor crimes.

32.     Defendant Lopez fosters an agency-wide culture of escalating minor criminal offenses into violent and deadly encounters.

33.     This culture has been continually displayed on Defendant Lopez' social media accounts, by his public comments, and by the violent policing culture that Defendant Lopez' practices, procedures, and protocols have created and perpetuated.

34.     By this means, Defendant Lopez, since becoming Osceola County's Sheriff, has encouraged his deputies to engage in violence and to seek out opportunities to use excessive force against persons, even where they are suspected of only minor crimes or violations.

35.     A few months after the "Busted by the Sheriff" video described above was posted to OCSO's Facebook page, the unlawful practices encouraged by Sheriff Lopez were visited on Plaintiff Jean Barreto.

36.     Prior to February 27, 2022, Plaintiff Jean Barreto had no criminal record.

37.     On and during the events of February 27, 2022, Plaintiff was unarmed and never brandished a weapon.

38.     At around 5:32 p.m. on the afternoon of February 27, 2022, Plaintiff was among a group of dirt-bike riders near the La Terraza Sports Bar on Donegan Road in Kissimmee.

39.     The group of motorcyclists were on a planned memorial ride to honor a rider who had died in an accident a year before. The ride was advertised on social media and garnered participation from individuals across several counties.

40.    The group was large; as the OCSO helicopter unit reported over the radio at the time, "they are everywhere."  A number of the dirt bike riders were doing wheelies.

41.    Several minutes before, there had been a report of an aggravated assault by a person on a motorcycle approximately a mile from La Terraza Sports Bar.

42.    Jean Barretto was not involved in that alleged assault.

43.    At around 5:33 p.m., Defendant Koffinas was driving on Donegan Road. He passed Plaintiff, who was riding a wheelie on his dirt bike down Donegan Road in the opposite direction.

44.    Defendant Koffinas turned around and attempted to stop Plaintiff, but Plaintiff drove off.

45.    Police cars swarmed the area around La Terraza Sports Bar on Donegan Road, and numerous dirt bike riders, including Plaintiff, drove off.

46.    The OCSO's helicopter unit then locked on to Plaintiff and tracked him, radioing his position to OCSO police cars.

47.    Multiple OSCO officers then began to pursue Plaintiff in their police cars.

48.    Over the course of this pursuit, however, the OCSO officers pursuing Plaintiff learned that Plaintiff was not the suspected armed motorcycle-assailant who had been reported earlier.

49.    Osceola County Deputies knew that Plaintiff, Jean Barreto was not the suspected armed assailant but continued their pursuit of him.

50.    Osceola County Deputies were told that Plaintiff, Jean Barretto did not match the description of the assailant, information which was radioed to Osceola County Deputies.

51.    Osceola County Deputy Teems, flying with the OCSO's helicopter, "Star 1" received the call and repeated to Deputy Koffinas and others that Jean Barreto did not match the description of the suspect in the reported aggravated assault.

    a.  Deputy Koffinas heard this communication.

    b.  Deputy Crawford heard this communication.

    c.  Deputy DeJesus heard this communication.

    d.  Deputy Dominguez heard this communication.

    e.  Deputy Maclean heard this communication.

52.    The OCSO watch commander identified as "Lima 10" communicated with Deputies about Jean Barreto not matching the description of the suspect in the reported aggravated assault.

    a.  Deputy Koffinas heard this communication.

    b.  Deputy Crawford heard this communication.

    c.  Deputy DeJesus heard this communication.

    d.  Deputy Dominguez heard this communication.

    e.  Deputy Maclean heard this communication.

53.    Despite the widespread knowledge among OCSO personnel that Jean Baretto was not suspected of the reported aggravated assault, the OCSO personnel continued to pursue him out of Osceola County and out of their jurisdiction.

54.    Deputy Teems, operating within the OCSO's helicopter, continued to pursue Plaintiff Jean Barreto despite being informed that Jean Barreto was not the suspect in the reported aggravated assault.

55.    Deputy Koffinas continued to pursue Jean Barreto despite being informed that Jean Barreto was not the suspect in the reported aggravated assault.

56.    Deputy Crawford continued to pursue Jean Barreto despite being informed that Jean Barreto was not the suspect in the reported aggravated assault.

57.    Deputy DeJesus continued to pursue Jean Barreto despite being informed that Jean Barreto was not the suspect in the reported aggravated assault.

58.    Deputy Dominguez continued to pursue Jean Barreto despite being informed that Jean Barreto was not the suspect in the reported aggravated assault.

59.    Deputy Maclean continued to pursue Jean Barreto despite being informed that Jean Barreto was not the suspect in the reported aggravated assault.

60.    The OCSO helicopter continued to track Plaintiff even after he had driven out of Osceola County and into Orlando, in Orange County, despite its pilot being informed that Jean Barreto was not the suspect in the reported aggravated assault.

61.    At approximately 5:50 p.m., Plaintiff arrived at a Wawa gas station located at 3951 Central Florida Parkway, Orlando, Orange County, Florida.

62.    On information and belief, none of the defendants, or anyone else at the OCSO, had contacted authorities in Orlando or Orange County regarding their pursuit of Plaintiff into Orlando and Orange County.

63.    At the gas station Plaintiff began to refuel his motorcycle at a pump.

64.    The OCSO helicopter unit, which had been tracking Plaintiff into Orlando, radioed Plaintiff's location to the Defendant Deputies.

65.    At this time, nobody in the OCSO, and none of the defendants, had reason to believe that Plaintiff had engaged in a violent crime that day.

66.     At approximately 5:53 p.m., Defendant Deputies Crawford and Koffinas both entered the Wawa parking lot in separate cars.

67.     Defendant Crawford hid behind an adjacent gas pump, crept up on Plaintiff, violently tackled Plaintiff from behind while he was still in the process of pumping gas, brought him to the ground, and began to attempt to pull off his helmet.

68.     A few seconds later Defendant Koffinas approached Defendant Crawford and Plaintiff and pulled out his taser.

69.     At this point, Defendant Crawford had already pinned Plaintiff face-down on the ground.

70.     Defendant Koffinas noticed gasoline on the ground pouring from the Plaintiff's motorcycle.

71.     Even though there was gasoline present and Plaintiff was pinned to the ground, Defendant Koffinas shocked him with the taser, and did so twice.

72.     In response to being shocked with the taser, Plaintiff yelled in agony and squirmed on the ground, briefly rolling over on his back.

73.     Immediately after Plaintiff had been tased, Defendants Crawford and Koffinas yelled at Plaintiff to "get on the ground!" In this moment Plaintiff was already pinned on the ground by two officers.

74.     Upon arriving to the scene Defendant DeJesus immediately smelled gas.

75.     Defendant Crawford yelled to his colleagues, "Kill the pump, kill the pump! There is gas, kill the pump!"

76.     Defendant DeJesus, in response to the commands from Defendant Crawford, hung up the gas pump nozzle of a vehicle at the adjacent gas pump #13.

77.    Defendant DeJesus did not attempt to stop the other officers from using their tasers to shock Plaintiff.

78.    Defendant Koffinas let go of his taser, allowing it to land on the ground near the puddle of gas leaking from the Plaintiff's motorcycle.

79.    At this point, Plaintiff was once again face down on the ground.

80.    Defendant Koffinas' right hand was on the back of Plaintiff's neck, pushing Plaintiff's face into the ground.

81.    Defendant Koffinas had also pulled Plaintiff's left arm and was twisting it behind Plaintiff's back.

82.    Meanwhile a third officer, who was Defendant Dominguez, Defendant DeJesus, or Defendant Maclean, was on Plaintiff's right side.  This officer had joined the other officers and was grabbing Plaintiff's right hand.

83.    Even though the presence of gas was obvious, this third officer did not attempt to stop any of the other officers from using their tasers.

84.    Defendant Crawford then picked up Defendant Koffinas' taser.

85.    In the space of a few seconds, Defendant Koffinas, Defendant Crawford, and the third officer (Defendant Maclean, Dejesus, or Dominguez), alternately yelled at Plaintiff "don't move" and "give me your fucking hands!" and, "get your hands up, do it now!"

86.    As this was happening, Defendant Crawford yelled "you're going to get tased again dude!"

87.    At this point, it was obvious to all officers present at the scene that there was exposed gasoline in the immediate vicinity of Plaintiff's body.

88.    None of the officers present, however, tried to stop Defendant Crawford from shocking Plaintiff with the taser again.

89.    Defendant Crawford did not give Plaintiff time to comply with this warning. Immediately after Defendant Crawford's statement, he pulled the trigger of Defendant Koffinas's taser to shock Plaintiff again.

90.    This deployment of the taser's electrical charge immediately ignited the gas pooled around Plaintiff and the officers.

91.    The resulting explosion and fire submerged Plaintiff's body in flames.

92.    Plaintiff ran from the scene, engulfed in fire, and collapsed several yards away from the gas pumps.

93.    One of the officers on the scene found a fire extinguisher and put out the fire that had consumed Plaintiff's body.

94.    Plaintiff pleaded to be taken to the hospital while sitting handcuffed on the pavement in life-threatening condition.

95.    In a complete disregard for his life, radio logs show that EMTs were called by an OSCO Deputy on scene from his cell phone requesting aid for two injured Deputies but no mention of the Plaintiff was made.

96.    EMTs that arrived found Plaintiff and called for a third ambulance to tend to him.

97.    Defendant Maclean then told Defendant Dominguez to place Plaintiff in handcuffs.

98.    Defendant Dominguez placed Plaintiff in handcuffs, even though there were severe, obvious burns over nearly all of Plaintiff's body.

99.    No weapons of any kind were located on or near Plaintiff at the gas station.

11

100.    Plaintiff was taken to the Orlando Regional Medical Center.

101.    The cause of the fire that burned Plaintiff was the electric discharge from Defendant Crawford's deployment of the taser, which ignited gas on and near Plaintiff's body.

102.    Plaintiff suffered severe second and third degree burns on his body from the neck down.

103.    For months after the burning, Plaintiff was without most of the skin on his body.

104.    Plaintiff fought for his life for one year in the trauma 1 ward of a hospital intensive care unit with burns over seventy-five percent of his body, his parents having been informed that there was a low likelihood of his survival.

105.    In order to save Plaintiff's life, medical specialists were required to perform a first-of-its-kind skin culture growing procedure on Plaintiff's body, while he remained in a medical-induced coma, as skin grafts from cadavers were rejected by his body.

106.    Plaintiff underwent excruciating pain and treatment for his injuries.

107.    For months after the burning, Plaintiff's body was wrapped and unwrapped in gauze daily, bleeding profusely during these twice-daily debridement procedures that lasted two ears each as he was without the requisite amount of skin to contain his body fluids.

108.    Defendant Crawford was eventually charged with a crime for causing the fire with the taser.

109.    On information and belief, Defendant Koffinas was not disciplined or reprimanded for firing the taser a moment earlier.

110.    On information and belief, apart from Defendant Crawford, none of the OCSO employees involved in pursuing and apprehending Plaintiff were reprimanded or disciplined for their conduct with respect to their pursuit and apprehension of Plaintiff.

111.    In statements after the incident Defendant Lopez, while acknowledging that Defendant Crawford fired the taser even though he knew gas was in the area, blamed Plaintiff for the extraordinary high-risk force used by OCSO deputies, and claimed that he did not see any other approach his deputies could have taken, because Plaintiff had failed to stop for them.

**The OCSO's Unlawful Practices and Ratification and Encouragement by Sheriff Lopez**

112.    The events leading to Plaintiff's immolation were the result of widespread practices of unlawful conduct within the OCSO, which were encouraged and exacerbated by Sheriff Lopez.

113.    There are widespread and settled customs within the OCSO of using excessive force against civilians, which predated Defendant Lopez's election as Osceola County Sheriff and continued after his election.  Examples of these customs and practices include:

a.  The March 15, 2018 unnecessary beating of Pedro Miranda by six OCSO deputies after pulling him out of a car in a parking lot.

b.  The April 7, 2019 violent arrest of Luis Rivera Guzman, including unnecessary use of tasers, punching, kicking, and hogtying a civilian by multiple OCSO deputies.

c.  The March 14, 2021 violent arrest and improper detention of Terrence A. Williams by OCSO deputies, including unnecessary lifting of a civilian by the arms after he was handcuffed.

d.  The April 27, 2022 violent arrest and killing of Jayden Baez by OCSO employees, described elsewhere in this complaint.

114.    Defendant Sheriff Lopez was sworn in as the Sheriff of Osceola County in January of 2021.

115.    In his capacity as the final policymaker of the OCSO, Defendant Sheriff Lopez's actions and inactions are those of Osceola County.

116.    Upon being elected, Defendant Lopez did not seek to change the OCSO's widespread practices of using excessive force.  To the contrary, he encouraged and ratified such conduct.

117.    Shortly after his swearing in, and in August 2021 at the latest, Defendant Sheriff Lopez authorized and announced a policy of using disproportionate force and resources to crack down on motorcycle and dirt bike riders in Osceola County who committed minor traffic violations.

118.    Defendant Sheriff Lopez authorized the use of immense resources to crack down on these minor traffic violations, including the usage of canines, the OCSO Aviation unit, an excess number of officers, and the confiscation of citizen's motorcycles.

119.    Defendant Sheriff Lopez knowingly encouraged and authorized members of the OCSO to disregard and violate Constitutional and Fourth Amendment rights of local residents to attempt to "go after" individuals committing infractions while driving motorcycles in Osceola County, including the condoning of excessive force.

120.    Defendant Lopez's encouragement of a "crackdown" on dirt bike riders has been part of his broader efforts to foster an agency-wide culture of escalating minor criminal offenses into violent and deadly scenes.

121.    Defendant Lopez's efforts to foster this culture have been continually on display in his social media accounts, his public comments, and by the violent policing culture that Defendant Lopez's practices, procedures, and protocols have created and perpetuated.

122.    Through these efforts, Defendant Lopez has ratified policies and procedures that have resulted in deadly and excessive force being used regularly during law enforcement actions by the OCSO, regardless of the severity of suspected crime.

123.    Defendant Sheriff Lopez's authorization to Deputies of the OCSO to disregard and violate the Constitutional and Fourth Amendment rights of Osceola citizens constituted a decision by a final policy maker of Osceola County.

124.    Defendant Sheriff Lopez's authorization to Deputies of the OCSO to disregard and violate the Constitutional and Fourth Amendment rights of citizens was maintained with deliberate indifference to and at the expense of the constitutional rights of citizens.

125.    Sheriff Lopez's indifference to and encouragement of this type of misconduct was on display in his response to the conduct of police leading to Plaintiff's immolation.

126.    On information and belief, in the wake of Plaintiff's immolation on February 27, 2022, Sheriff Lopez and Osceola County made no changes to OCSO policies and practices, including the ongoing "crackdown" on dirt bikes or the OCSO's practice of using dramatic and excessive force to respond to violations and minor crimes.

127.    Sheriff Lopez's continued indifference to excessive and improper force used by OCSO employees enabled and encouraged those employees to use dramatic and gratuitous force, both before and after Plaintiff's immolation.

128.    For example, exactly two months after his catastrophic encounter with Plaintiff, Defendant Koffinas and several other OCSO deputies engaged in a high-risk "box" maneuver to "trap" several young who were in car in a Target parking lot.

129.    During this encounter, Defendant Koffinas performed the aggressive "box" maneuver while another OCSO deputy shot three people in the car, killing a young man named Jayden Baez.

130.    The police engaged in this gratuitous and dramatic use of force in response to an allegation that the young people in the car had shoplifted $46 worth of pizza and Pokemon cards from the Target.

131.    In public statements after Mr. Baez's killing, Sheriff Lopez  rejected the notion that his deputies had used excessive force in response to a suspected shoplifting, or that his office engaged in excessive responses to minor crimes generally.

**INJURIES AND DAMAGES**

132.    As a result of the Defendants' unlawful actions, Plaintiff has suffered damages and will continue to suffer damages, including, but not limited to:

    a.  Severe permanent physical injury resulting in pain and suffering and requiring extensive medical treatment and attendant expenses, from February 27, 2022 and for the rest of his life;

    b.  Prevention of the ability to work in numerous fields and loss of earnings;

    c.  Monetary losses;

    d.  Physical inconvenience and discomfort, loss of time, emotional trauma, anxiety and distress, disfigurement, humiliation, embarrassment, social isolation, impairment to reputation, and shortened life span.

These losses are permanent and continuing and Plaintiff will suffer losses in the future.

133.    Plaintiff's injuries described herein were a direct, foreseeable, and proximate result of the OCSO's widespread practices of excessive force, as well as Defendant Lopez's indifference to and encouragement of those practices.

134.    Plaintiff is additionally entitled to recover punitive damages against the individual defendants in this case.

135.    Plaintiff is entitled to recovery of costs and reasonable attorneys' fees and costs as prescribed under 42 U.S.C. § 1988 and any other applicable law.

## CAUSES OF ACTION

### COUNT I—42 U.S.C. § 1983—Fourth Amendment
*Defendant Crawford*

136.    Plaintiff hereby incorporates and realleges Paragraphs 1 through 122 as though fully pleaded herein.

137.    Defendant Crawford engaged in excessive and unnecessary force in the course of arresting Plaintiff.  In so doing, Defendant Crawford violated Plaintiff's rights to be free from excessive force.

138.    At all relevant times, Defendant Crawford was acting under color of state law, as an agent of OCSO, and within the scope of his employment and authority as a duly-certified law enforcement officer of Osceola County.

139.    As a direct and proximate result of Defendant Crawford's violation of Plaintiff's rights, Plaintiff suffered catastrophic injuries and damages, as described in this complaint.

140.    Punitive damages are available against Defendant Crawford and are hereby sought by Plaintiff given the reprehensibility of Defendant Crawford's conduct and the need to deter others from engaging in similar conduct.

141.    Plaintiff is entitled to recovery of costs and reasonable attorneys' fees as prescribed under 42 U.S.C. § 1988 and other applicable laws.

## COUNT II—State Law Assault and Battery
*Defendant Crawford*

142.    Plaintiff hereby incorporates and realleges Paragraphs 1 through 122 as though fully pleaded herein.

143.    Defendant Crawford used force that was excessive and unreasonable under the circumstances against Plaintiff, injuring him as described herein.

144.    The actions of Defendant Crawford constituted an unwarranted assault and battery upon Plaintiff.

145.    Defendant Crawford did cause harm to Plaintiff tackling him, forcing him to the ground, and shocking him with a taser despite knowing of the presence of gasoline.

146.    Defendant Crawford shocked Plaintiff with a taser with willful, wanton, and reckless disregard for the danger this action posed to Plaintiff, given the presence of gasoline in Plaintiff's immediate area.

147.    As a direct and proximate result of Defendant Crawford's act, Plaintiff suffered and continues to suffer damages, including physical injury, pain and suffering, disfigurement, mental anguish, loss of capacity to enjoy life, expense of hospitalization and medical care.

148.    Punitive damages are available against Defendant Crawford and are hereby sought by Plaintiff given the reprehensibility of Defendant Crawford's conduct and the need to deter others from engaging in similar conduct.

## COUNT III—State Law Intentional Infliction Of Emotional Distress
### *Defendant Crawford*

149.    Plaintiff hereby incorporates and realleges Paragraphs 1 through 122 as though fully pleaded herein.

150.    Defendant Crawford shocked Plaintiff with a taser even though he knew gasoline was present, which would cause Plaintiff to suffer severe burns if it ignited.

151.    In shocking Plaintiff with a taser when gasoline was present, Defendant Crawford knew or should have known that emotional distress would likely result if the gasoline ignited.

152.    Defendant Crawford's shocking of Plaintiff with a taser even though he knew gasoline was present was outrageous.

153.    Defendant Crawford's shocking of Plaintiff ignited gasoline which burned Plaintiff and caused and continues to cause Plaintiff to suffer emotional distress.

154.    The emotional distress suffered by Plaintiff was and is severe.

## COUNT IV—42 U.S.C. § 1983—Fourth Amendment
### *Defendant Koffinas*

155.    Plaintiff hereby incorporates and realleges Paragraphs 1 through 122 as though fully pleaded herein.

156.    Defendant Koffinas engaged in excessive and unnecessary force in the course of arresting Plaintiff.  In so doing, Defendant Koffinas violated Plaintiff's rights to be free from excessive force.

157.    Defendant Koffinas further failed to intervene to prevent the use of excessive force against Plaintiff.

158. At all relevant times, Defendant Koffinas was acting under color of state law, as an agent of OCSO, and within the scope of his employment and authority as a duly-certified law enforcement officer of Osceola County.

159. As a direct and proximate result of Defendant Koffinas's violation of Plaintiff's rights, Plaintiff suffered catastrophic injuries and damages, as described in this complaint.

160. Punitive damages are available against Defendant Koffinas and are hereby sought by Plaintiff given the reprehensibility of Defendant Koffinas's conduct and the need to deter others from engaging in similar conduct.

161. Plaintiff is entitled to recovery of costs and reasonable attorneys' fees as prescribed under 42 U.S.C. § 1988 and other applicable laws.

### COUNT V—42 U.S.C. § 1983—Fourth Amendment
*Defendant DeJesus*

162. Plaintiff hereby incorporates and realleges Paragraphs 1 through 122 as though fully pleaded herein.

163. Defendant DeJesus engaged in excessive and unnecessary force in the course of arresting Plaintiff.  In so doing, Defendant DeJesus violated Plaintiff's rights to be free from excessive force.

164. Defendant DeJesus further failed to intervene to prevent the use of excessive force against Plaintiff.

165. At all relevant times, Defendant DeJesus was acting under color of state law, as an agent of OCSO, and within the scope of his employment and authority as a duly-certified law enforcement officer of Osceola County.

166. As a direct and proximate result of Defendant DeJesus's violation of Plaintiff's rights, Plaintiff suffered catastrophic injuries and damages, as described in this complaint.

167.    Punitive damages are available against Defendant DeJesus and are hereby sought by Plaintiff given the reprehensibility of Defendant DeJesus's conduct and the need to deter others from engaging in similar conduct.

168.    Plaintiff is entitled to recovery of costs and reasonable attorneys' fees as prescribed under 42 U.S.C. § 1988 and other applicable laws.

## COUNT VI—42 U.S.C. § 1983—Fourth Amendment
### *Defendant Dominguez*

169.    Plaintiff hereby incorporates and realleges Paragraphs 1 through 122 as though fully pleaded herein.

170.    Defendant Dominguez engaged in excessive and unnecessary force in the course of arresting Plaintiff.  In so doing, Defendant Dominguez violated Plaintiff's rights to be free from excessive force.

171.    Defendant Dominguez further failed to intervene to prevent the use of excessive force against Plaintiff.

172.    At all relevant times, Defendant Dominguez was acting under color of state law, as an agent of OCSO, and within the scope of his employment and authority as a duly-certified law enforcement officer of Osceola County.

173.    As a direct and proximate result of Defendant Dominguez's violation of Plaintiff's rights, Plaintiff suffered catastrophic injuries and damages, as described in this complaint.

174.    Punitive damages are available against Defendant Dominguez and are hereby sought by Plaintiff given the reprehensibility of Defendant Dominguez's conduct and the need to deter others from engaging in similar conduct.

175.    Plaintiff is entitled to recovery of costs and reasonable attorneys' fees as prescribed under 42 U.S.C. § 1988 and other applicable laws.

## COUNT VII—42 U.S.C. § 1983—Fourth Amendment
### *Defendant Maclean*

176.    Plaintiff hereby incorporates and realleges Paragraphs 1 through 122 as though fully pleaded herein.

177.    Defendant Maclean engaged in excessive and unnecessary force in the course of arresting Plaintiff.  In so doing, Defendant Maclean violated Plaintiff's rights to be free from excessive force.

178.    Defendant Maclean further failed to intervene to prevent the use of excessive force against Plaintiff.

179.    At all relevant times, Defendant Maclean was acting under color of state law, as an agent of OCSO, and within the scope of his employment and authority as a duly-certified law enforcement officer of Osceola County.

180.    As a direct and proximate result of Defendant Maclean's violation of Plaintiff's rights, Plaintiff suffered catastrophic injuries and damages, as described in this complaint.

181.    Punitive damages are available against Defendant Maclean and are hereby sought by Plaintiff given the reprehensibility of Defendant Maclean's conduct and the need to deter others from engaging in similar conduct.

182.    Plaintiff is entitled to recovery of costs and reasonable attorneys' fees as prescribed under 42 U.S.C. § 1988 and other applicable laws.

## COUNT VIII—42 U.S.C. § 1983
*Defendant Lopez (in his individual capacity)*

183. Plaintiff hereby incorporates and realleges Paragraphs 1 through 122 as though fully pleaded herein.

184. As Director of the OCSO, Defendant Lopez supervised OCSO employees in carrying out their duties, including policing.

185. There was a widespread practice within the OCSO of using excessive force against civilians.

186. Sheriff Lopez was indifferent to this widespread use of force and did not take reasonable steps to prevent it.

187. To the contrary, Sheriff Lopez encouraged excessive, dramatic uses of force by OCSO employees against civilians, including in response to violations or minor crimes, which included traffic violations associated with dirt bike riding in particular.

188. As a proximate result of Sheriff Lopez's indifference to and encouragement of excessive force against civilians, OSCO deputies, including Defendant Crawford, used excessive force against Plaintiff, causing the catastrophic injuries and damages, as described in this complaint.

189. Punitive damages are available against Defendant Lopez and are hereby sought by Plaintiff given the reprehensibility of Defendant Lopez's conduct and the need to deter others from engaging in similar conduct.

190. Plaintiff is entitled to recovery of costs and reasonable attorneys' fees as prescribed under 42 U.S.C. § 1988 and other applicable laws.

## COUNT IX—*Negligence*
*Defendant Lopez*

191.    Plaintiff hereby incorporates and realleges Paragraphs 1 through 122 as though fully pleaded herein.

192.    As Director of the OCSO, Defendant Lopez supervised OCSO employees in carrying out their duties, including policing.

193.    There was a widespread practice within the OCSO of using excessive force against civilians.

194.    Defendant Lopez knew or should have known of a widespread culture within the OCSO of using excessive force against civilians.

195.    Defendant Lopez turned a blind eye to this problem and did not take reasonable measures to prevent the use of excessive force against civilians going forward.

196.    To the contrary, Defendant Lopez encouraged the use of dramatic and unreasonable force against civilians, including those who were suspected of minor crimes and violations.

197.    As a proximate result of Sheriff Lopez's indifference to and encouragement of excessive force against civilians, OSCO deputies, including Defendant Crawford, used excessive force against Plaintiff, causing the catastrophic injuries and damages, as described in this complaint.

## COUNT X—42 U.S.C. § 1983
*Oceola County and Sheriff Lopez (in his official capacity)*

198.    Plaintiff hereby incorporates and realleges Paragraphs 1 through 122 as though fully pleaded herein.

199.    Osceola County has a custom and widespread practice of using excessive force against civilians.

200.    Osceola Couty's final policymaker, Sheriff Lopez, is indifferent to Osceola County's custom and widespread practice of using excessive force, having failed to take reasonable steps to prevent its use.

201.    Osceola County's final policymaker, Sheriff Lopez, encouraged and promoted the use of excessive force against civilians, including and in particular the use of excessive force against persons suspected of violations and minor crimes, including traffic violations commonly attributed to dirt-bike riders.

202.    By permitting the existence of a widespread practice of excessive force and affirmatively encouraging its use, Osceola County endorsed and encouraged OSCO employees to use excessive and dramatic force against civilians, and thereby ratified the use of such excessive force.

203.    This policy of indifference to and encouragement of the use of excessive force was a moving force behind the dramatic and inappropriate force used against Plaintiff, resulting in his injuries, which are described in this complaint.

204.    Plaintiff is entitled to recovery of costs and reasonable attorneys' fees as prescribed under 42 U.S.C. § 1988 and other applicable laws.

### COUNT XI—State law—*Respondeat Superior*
Oceola County

205.    Plaintiff hereby incorporates and realleges Paragraphs 1 through 122 as though fully pleaded herein.

206.    Osceola County, through its agent, Sheriff Lopez, was indifferent to the widespread use of excessive force by OSCO deputies, and even, through Sheriff Lopez, encouraged the use of such force.

207.    Osceola County, through its agent, Defendant Crawford, used force that was excessive and unreasonable under the circumstances against Plaintiff, injuring him as described herein.

208.    The actions of Defendant Crawford constituted an unwarranted battery upon Plaintiff.

209.    The County is liable for the actions of Defendant Crawford.

210.    The County is liable for the actions and inactions of Defendant Lopez.

211.    As a direct and proximate result of the actions of Defendant Crawford, Plaintiff suffered catastrophic injuries, which are described in this complaint.

212.    As a direct and proximate result of the actions and inactions of Defendant Lopez, Plaintiff suffered catastrophic injuries, which are described in this complaint.

### COUNT XII—Indemnification
*Osceola County*

213.    Plaintiff hereby incorporates and realleges Paragraphs 1 through 122124 as though fully pleaded herein.

214.    Plaintiff suffered catastrophic injuries as a result of the actions and inaction of Defendants Crawford, Koffinas, DeJesus, Dominguez, Maclean, and Lopez, as described in this complaint.

215.    In engaging in the aforesaid actions and inactions, Defendants Crawford, Koffinas, DeJesus, Dominguez, Maclean, and Lopez were acting within their scope of employment by the OCSO and Osceola County.

216.    In this Count, Plaintiff demands indemnification from Osceola County for the injuries caused by the actions and inactions of Defendants Crawford, Koffinas, DeJesus, Dominguez, Maclean, and Lopez.

## PRAYERS FOR RELIEF

WHEREFORE, Plaintiff Jean Louis Barreto-Baerga prays for judgment against Defendants as follows:

217.    As to Count I, a money judgment against Defendant Crawford for all compensatory damages and special damages, punitive damages, cost disbursements, pre- and post-judgment interest, and attorney fees, as allowed by law.

218.    As to Count II, a money judgment against Defendant Crawford for all compensatory damages and special damages, punitive damages, cost disbursements, and pre- and post-judgment interest, as allowed by law.

219.    As to Count III, a money judgment against Defendant Crawford for all compensatory damages and special damages, punitive damages, cost disbursements, and pre- and post-judgment interest, as allowed by law.

220.    As to Count IV, a money judgment against Defendant Koffinas for all compensatory damages and special damages, punitive damages, cost disbursements, pre- and post-judgment interest, and attorney fees, as allowed by law.

221.    As to Count V, a money judgment against Defendant DeJesus for all compensatory damages and special damages, punitive damages, cost disbursements, pre- and post-judgment interest, and attorney fees, as allowed by law.

222.    As to Count VI, a money judgment against Defendant Dominguez for all compensatory damages and special damages, punitive damages, cost disbursements, pre- and post-judgment interest, and attorney fees, as allowed by law.

223.    As to Count VII, a money judgment against Defendant Maclean for all compensatory damages and special damages, punitive damages, cost disbursements, pre- and post-judgment interest, and attorney fees, as allowed by law.

224.    As to Count VIII, a money judgment against Defendant Lopez for all compensatory damages and special damages, punitive damages, cost disbursements, pre- and post-judgment interest, and attorney fees, as allowed by law.

225.    As to Count IX, a money judgment against Defendant Lopez for all compensatory damages and special damages, punitive damages, cost disbursements, and pre- and post-judgment interest, as allowed by law.

226.    As to Count X, a money judgment against Osceola County and Sheriff Lopez in his official capacity for all compensatory damages and special damages, cost disbursements, pre- and post-judgment interest, and attorney fees, as allowed by law.

227.    As to Count XI, a money judgment against Osceola County for all compensatory damages and special damages, punitive damages, cost disbursements, and pre- and post-judgment interest, as allowed by law.

228.    As to Count XII, judgment for Osceola County to make payments for any judgment rendered against Defendant Crawford, Defendant Koffinas, Defendant DeJesus, Defendant Dominguez, Defendant Maclean, and Defendant Lopez in this action, including compensatory damages and special damages, punitive damages, cost disbursements, and pre- and post-judgment interest, as allowed by law.

## **JURY DEMAND**

229.    Plaintiff hereby demands a trial by jury as set forth in the Seventh Amendment to the Unites States Constitution and Federal Rule of Civil Procedure 38.


**Date: January 22, 2025**                     **/s/ _Antonio Romanucci_**

**ROMANUCCI & BLANDIN, LLC**
Antonio Romanucci (*pro hac vice forthcoming)*
(Illinois ARDC No. 6190290)
Bhavani Raveendran (*pro hac vice forthcoming*)
(Illinois ARDC No. 6309968)
Stephen Weil (*pro hac forthcoming*)
(Illinois ARDC No. 6291026)
321 North Clark St., Suite 900
Chicago, Illinois 60654
Tel: (312) 458-1000
Fax: (312) 458-1004
Email: aromanucci@rblaw.net
Email: b.raveendran@rblaw.net
Email: sweil@rblaw.net

Albert Jason Yonfa, Jr.
Pendas Law Firm
625 E. Colonial Dr. Orlando Fl 32803
407-352-3535
ayonfa@pendaslaw.com